Slip Op. 16-74

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHENZHEN XINBODA INDUSTRIAL CO., LTD., <br><br> Plaintiff, <br><br><br> HEBEI GOLDEN BIRD TRADING CO., LTD., JINXIANG RICHFAR FRUITS & VEGETABLES CO., LTD., QINGDAO LIANGHE INTERNATIONAL TRADE CO., LTD., SHANDONG CHENHE INTERNATIONAL TRADING CO., LTD., and WEIFANG HONGQIAO INTERNATIONAL LOGISTICS CO., LTD., <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC., <br><br> Defendant-Intervenors. | Before: Jane A. Restani, Judge <br><br> Consol. Court No. 15-00179 |

### OPINION

[Commerce's final results in antidumping duty administrative review sustained in part and remanded in part.]

Dated: July 27, 2016

   Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, DC, argued for plaintiff.  With him on the brief were J. Kevin Horgan, Alexandra H. Salzman, and Judith L. Holdsworth.

     <u>Robert T. Hume</u>, Hume & Associates, LLC, of El Prado, NM, argued for consolidated plaintiffs.

     <u>Emma E. Bond</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>Khalil N. Gharbieh</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

     <u>Michael J. Coursey</u>, Kelley Drye & Warren, LLP, of Washington, DC, argued for defendant-intervenors.  With him on the brief were <u>John M. Herrmann, II</u> and <u>Joshua R. Morey</u>.

     Restani, Judge:  This action challenges the Department of Commerce's ("Commerce") final results of the nineteenth administrative review of the antidumping ("AD") duty order on fresh garlic from the People's Republic of China ("PRC").  <u>Fresh Garlic from the People's Republic of China:  Final Results and Partial Rescission of the 19th Antidumping Duty Administrative Review; 2012–2013</u>, 80 Fed. Reg. 34,141, 34,141–44 (Dep't Commerce June 15, 2015) ("<u>Final Results</u>").  Before the court are the motions for judgment on the agency record pursuant to U.S. Court of International Trade ("CIT") Rule 56.2 by Chinese producers Hebei Golden Bird Trading Co., Ltd. ("Golden Bird"), Jinxiang Richfar Fruits & Vegetables Co., Ltd., Qingdao Lianghe International Trade Co., Ltd., Shandong Chenhe International Trading Co., Ltd., and Weifang Hongqiao International Logistics Co., Ltd. (collectively, "Consolidated Plaintiffs"), <u>see</u> Mem. in Supp. of Pls.' Mot. for J. on the Agency R., ECF No. 37 ("Golden Bird Br."), and Shenzhen Xinboda Industrial Co., Ltd., ("Xinboda"), <u>see</u> Pl. Shenzhen Xinboda Indus. Co., Ltd. Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 31 ("Xinboda Br.").  For the reasons stated below, Commerce's <u>Final Results</u> are sustained in part and remanded in part.

## BACKGROUND

On November 16, 1994, Commerce issued an AD duty order covering fresh garlic from

the PRC.  Antidumping Duty Order:  Fresh Garlic from the People's Republic of China, 59 Fed.

Reg. 59,209, 59,209 (Dep't Commerce Nov. 16, 1994).  The nineteenth annual administrative

review of that AD duty order was initiated on December 30, 2013, and covers the period of

review ("POR") of November 1, 2012, through October 31, 2013.[1]  Initiation of Antidumping

and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 78 Fed.

Reg. 79,392, 79,393, 79,395–97 (Dep't Commerce Dec. 30, 2013) ("Initiation Notice").

Commerce limited its review to two mandatory respondents, selecting the two largest producers

by volume, Golden Bird and Jinxiang Hejia Co., Ltd. ("Hejia").[2]  Respondent Selection Mem. at

3–5, PD 61 (Apr. 28, 2014).

The PRC is considered by Commerce to be a non-market economy ("NME").  In

calculating a dumping margin for products from an NME country, Commerce compares the

goods' normal value,[3] derived from factors of production as valued in a surrogate market

---

[1] Commerce must annually review and determine the amount of an AD duty if it receives a
request to do so.  See 19 U.S.C. § 1675(a) (2012).

[2] Commerce may limit its review to "exporters or producers accounting for the largest volume of
the subject merchandise from the exporting country that can be reasonably examined" if
individual examinations are not practicable "because of a large number of exporters or producers
involved in the . . . review[.]"  19 U.S.C. § 1677f-1(c)(2)(B).

[3] Normal value is the price

> at a time reasonably corresponding to the time of the sale used to determine the
> export price or constructed export price . . . at which the foreign like product is first
> sold . . . for consumption in the exporting country, in the usual commercial
> quantities and in the ordinary course of trade and, to the extent practicable, at the

(continued . . .)

economy country, to the goods' export price.[4]  Commerce must use the "best available

information" in selecting surrogate data.  19 U.S.C. § 1677b(c)(1)(B) (2012).  The surrogate data

must "to the extent possible" be from a market economy country that is "at a level of economic

development comparable to that of the nonmarket economy country, and" is a "significant

producer[] of comparable merchandise."[5]  Id. at § 1677b(c)(4).

On June 25, 2014, five days prior to Commerce's deadline for questionnaire responses,

Petitioners, the Fresh Garlic Producers Association ("FGPA"), placed on the record information

that alleged Golden Bird and Hejia's shipment volumes were not accurately reported in their

---

same level of trade as the export price or constructed export price[.]

19 U.S.C. § 1677b(a)(1)(A),(B)(i).

[4] Export price is

the price at which the subject merchandise is first sold . . . before the date of
importation by the producer or exporter of the subject merchandise outside of the
United States to an unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States[.]

19 U.S.C. § 1677a(a).

[5] For each administrative review, Commerce typically selects a primary surrogate country from a
list of countries that it considers to be at a level of economic development comparable to that of
the NME country, based upon per capita gross national income ("GNI").  See Policy Bulletin
04.1, Non-Market Economy Surrogate Country Selection Process, (Mar. 1, 2004), available at
http://enforcement.trade.gov/policy/bull04-1.html (last visited July 14, 2016).  The list of such
countries for the PRC in the nineteenth administrative review included South Africa, Colombia,
Bulgaria, Thailand, Ecuador, and Indonesia.  List of Surrogate Countries at 2, bar code 3180274-
02 (Jan. 30, 2014).  Notably, this list does not include the Philippines, which Commerce selected
as the primary surrogate country in the eighteenth administrative review.  Issues and Decision
Memorandum for the Final Results of Antidumping Duty Administrative Review:  Fresh Garlic
from the People's Republic of China; 2011–2012 Administrative Review, A-570-831, (June 23,
2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-15279-1.pdf (last visited
July 14, 2016).

Section A questionnaire responses.  Pet'rs' Submission of New Factual Information at 2–6, PD

137 (June 25, 2014) ("Pet'rs' Allegations").  Specifically, FGPA claimed that the mandatory

respondents' reported shipment data was different from that reported by the General

Administration of Customs of the PRC and that the shipment data included export volumes

actually shipped by other Chinese exporters that were subject to the PRC-wide rate.  See id. at 4–

6.  Following these allegations, Xinboda wrote to Commerce requesting that it be added as either

an additional mandatory respondent or voluntary respondent, citing concerns that Commerce

would not have "sufficient margins based on cooperating respondents who earn separate rates

based on their actual data to apply to separate rate applicants."  Xinboda's Req. for Selection as

Respondent at 2, bar code 3212864-01 (July 1, 2014).  Xinboda also claimed that the Petitioners'

allegations called into question the accuracy of the data that was used to select the mandatory

respondents.  Id. at 3–4.  Commerce rejected the request, noting that both mandatory respondents

were still actively participating and that Xinboda had failed to submit in a timely fashion the

responses necessary to be considered as a voluntary respondent.  Commerce's Resp. to Xinboda

Respondent Req. at 2–3, bar code 3220285-01 (Aug. 6, 2014).  After being granted extensions,

the final set of questionnaire responses for the mandatory respondents were ultimately due on

June 27, 2014.  See Grant of Extension for Golden Bird's Quest. Resps. at 1, bar code 3202818-

01 (May 19, 2014); Grant of Extension for Hejia Quest. Resps. at 1, bar code 3210224-01 (June

19, 2014).

        In August 2014, and also in response to FGPA's allegations, Commerce issued

supplemental questionnaires to Golden Bird and Hejia, requesting complete Chinese Export

Declaration Forms ("export declarations") and certain authenticated inspection certificates

("Phyto-sanitary certificates") to substantiate the mandatory respondents' declared export

volumes.  Suppl. Golden Bird Quest. at 1 & Attach. 1, bar code 3222078-01 (Aug. 15, 2014);

Suppl. Hejia Quest. at 1 & Attach., PD 169 (Aug. 18, 2014).[6]  Golden Bird responded on

September 5, 2014, providing a portion of the export declarations and Phyto-sanitary certificates

requested.  See Commerce's Golden Bird Analysis Mem. at 2, CD 106 (Dec. 1, 2014) ("Golden

Bird Analysis Mem.").  On September 29, 2014, Commerce issued a Second Supplemental

Questionnaire to Golden Bird requesting the remaining export declarations and Phyto-sanitary

certificates.  Second Suppl. Golden Bird Quest. at 1 & Attach., PD 195 (Sept. 29, 2014).  Golden

Bird submitted a response to the Second Supplemental Questionnaire on October 14, 2014, again

providing only a portion of the total documentation requested.  See Golden Bird Analysis Mem.

at 2.

     The preliminary results of the review were published on December 8, 2014.  Fresh Garlic

From the People's Republic of China:  Preliminary Results of the Nineteenth Antidumping Duty

Administrative Review; 2012–2013, 79 Fed. Reg. 72,625, 72,625–29 (Dep't Commerce Dec. 8,

2014) ("Preliminary Results").  Commerce preliminarily determined that both Golden Bird and

Hejia had failed to demonstrate their status as separate from the PRC-wide entity,[7] and that the

---

[6] Hejia did not submit a response to the initial supplemental questionnaire and on September 12, 2014, withdrew its participation in the review.  Hejia's Withdrawal from Review at 1, bar code 3227882-01 (Sept. 12, 2014); Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic of China; 2012-2013 Administrative Review at 3–4, A-570-831, (June 5, 2015), available at http://enforcement.trade.gov/frn/summary/prc/2015-14656-1.pdf (last visited July 15, 2016) ("I&D Memo").

[7] In the NME context, Commerce has adopted a rebuttable presumption that all companies within the NME country are subject to government control and, thus, should be assessed a single AD

(continued . . .)

PRC-wide rate of $4.71/kg would be assigned as total adverse facts available ("total AFA").[8] Id. at 72,625–27; see also Decision Memorandum for the Preliminary Results of the 2012–2013 Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic of China at 10–20, A-570-831, (Dec. 1, 2014), available at http://enforcement.trade.gov/frn/summary/prc/ 2014-28688-1.pdf (last visited July 15, 2016) ("Preliminary I&D Memo").  Commerce deemed seven companies, including Xinboda, eligible for a separate rate.  Preliminary Results, 79 Fed. Reg. at 72,626; see also Preliminary I&D Memo at 9.  Because the margins for all individually examined PRC producers were based solely on total AFA, Commerce assigned the separate rate respondents a rate of $1.82/kg, the dumping margin calculated for the separate rate respondents in the immediately preceding administrative review, the eighteenth.  Preliminary Results, 79 Fed. Reg. at 72,626–27; see also Preliminary I&D Memo at 9.  On June 15, 2015, Commerce issued the unchanged final results of the review, in which Commerce continued to assign the $4.71/kg PRC-wide rate to the mandatory respondents and the $1.82/kg rate to exporters and producers

---

duty rate.  See Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1353 (Fed. Cir. 2015).  Here, because Commerce considers the PRC to be an NME, that rate is referred to as the PRC-wide rate.

[8] Although the phrase "total AFA" is not referenced in either the statute or the agency's regulations, it can be understood, within the context of this case, as referring to Commerce's application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e to arrive at a total replacement margin.  If, when applying facts otherwise available to fill gaps in the record, Commerce determines

> that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce, Commerce, in calculating a dumping margin], may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available[.]

19 U.S.C. § 1677e(b).

eligible for separate rates, including Xinboda.  Final Results, 80 Fed. Reg. at 34,141–42; see also

Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative

Review:  Fresh Garlic from the People's Republic of China; 2012-2013 Administrative Review

at 1, A-570-831, (June 5, 2015), available at http://enforcement.trade.gov/frn/summary/prc/2015-

14656-1.pdf (last visited July 15, 2016) ("I&D Memo").

      Golden Bird challenges[9] two aspects of Commerce's Final Results.  First, Golden Bird

disputes Commerce's finding that it did not cooperate to the best of its ability and the subsequent

assignment of total AFA.  Golden Bird Br. at 11–18.  Second, Golden Bird contests the selection

of the PRC-wide rate as its total AFA rate.  Id. at 19–23.

      Xinboda challenges Commerce's Final Results on three grounds.  First, Xinboda contests

the rejection of its request to become an additional mandatory respondent.  Xinboda Br. at 9–13.

Second, Xinboda contests the rejection of its request to become a voluntary respondent.  Id. at

14–16.  Third, Xinboda challenges the application of the eighteenth administrative review's

$1.82/kg rate as the separate rate for this review. Id. at 16–20.

      The government and FGPA respond that Commerce's decision to apply total AFA was

justified due to Golden Bird's failure to submit complete export declarations and Phyto-sanitary

certificates.  Def. Resp. to Consol. Pls.' Mots. for J. upon the Agency R. 12–16, ECF No. 44

("Gov't Resp."); Def.-Intvrs.' Resp. in Opp'n to Pls.' Mots. for J. on the Agency R. 16–23, ECF

No. 46  ("FGPA Resp.").  They also argue that Commerce properly disregarded Golden Bird's

separate rate information due to the "fundamental deficiencies resulting from the respondent's

---

[9] Although Consolidated Plaintiffs, which include Golden Bird, filed a joint brief, because all
relevant arguments raised relate to Golden Bird, the court refers to all arguments made by
Consolidated Plaintiffs as arguments made by "Golden Bird."

lack of cooperation," and correctly assigned the PRC-wide rate.  Gov't Resp. at 16–22; <u>see also</u> FGPA Resp. at 23–29.  They also contend that Commerce sufficiently corroborated the $4.71/kg PRC-wide rate.  Gov't Resp. at 24–28; FGPA Resp. at 29–31.

 The government further responds that Xinboda did not exhaust its administrative remedies and therefore is not able to appeal the selection of the mandatory respondents and, alternatively, that Commerce's selection of Golden Bird and Hejia as mandatory respondents was proper.  Gov't Resp. at 31–39; <u>see also</u> FGPA Resp. at 33–40.  The government and FGPA contend that Xinboda's voluntary respondent challenge fails because Xinboda failed to submit questionnaire responses in a timely fashion.  Gov't Resp. at 39–41; FGPA Resp. at 31–33.  And, they argue that Commerce reasonably exercised its discretion in applying the eighteenth administrative review's separate rate as the separate rate in the present nineteenth administrative review.  Gov't Resp. at 42–45; FGPA Resp. at 40–43.

## JURISDICTION AND STANDARD OF REVIEW

 The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012).  The court upholds Commerce's determination in an administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I. Golden Bird

 Golden Bird argues that Commerce improperly applied total AFA because Golden Bird provided all export declarations and Phyto-sanitary certificates that were available to the company and that it had valid reasons for not maintaining complete copies of the certificates.

Golden Bird Br. at 11–19.  Golden Bird also challenges Commerce's application of the PRC-wide rate to Golden Bird as improperly disregarding Golden Bird's separate rate information.  Id. at 19–20.  Alternatively, Golden Bird argues that the PRC-wide rate of $4.71/kg, which was calculated in an earlier review, does not represent commercial reality and was not properly corroborated.  Id. at 21–23.

The government and FGPA respond that Commerce properly applied total AFA because Golden Bird failed to provide all export declarations and Phyto-sanitary certificates, and Golden Bird admitted to submitting potentially false pricing information to Chinese customs.  Gov't Resp. at 7–16; FGPA Resp. at 16–23.  They also argue that Commerce's selection of the PRC-wide rate was lawful because Golden Bird failed to demonstrate that it was eligible for a separate rate as Commerce could not trust the entirety of Golden Bird's questionnaire responses and because Commerce properly corroborated the PRC-wide rate.  Gov't Resp. at 16–28; FGPA Resp. at 23–31.

As detailed below, Commerce properly applied total AFA to Golden Bird, but its treatment of Golden Bird as part of a PRC-wide entity was unlawful.  Accordingly, Commerce's Final Results are remanded to assess, based on relevant evidence, whether Golden Bird should have received a separate rate, and select an appropriate rate.

A.      Application of Total Adverse Facts Available

As described by the Federal Circuit, application of AFA is a two-part inquiry.  See Mueller Comercial de Mex., S. de R.L. de C.V. v. United States, 753 F.3d 1227, 1231–32 (Fed. Cir. 2014); Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  First, Commerce shall use "facts otherwise available" if a party:

>  (A) withholds information that has been requested by [Commerce] . . . ,
>  (B) fails to provide such information by the deadlines for submission of the
>  information or in the form and manner requested . . . ,
>  (C) significantly impedes a proceeding . . . , or
>  (D) provides such information but the information cannot be verified . . . .

19 U.S.C. § 1677e(a)(2).  In using facts otherwise available, Commerce must fill gaps in the

record if it has received less than the full and complete facts needed to make a determination

because a party has failed to provide requested information within the deadline for submission.

Nippon Steel, 337 F.3d at 1381 ("The reason for the failure is of no moment.").

  Second, Commerce may apply an adverse inference in selecting from the facts otherwise

available, or AFA, if the party "has failed to cooperate by not acting to the best of its ability to

comply with a request for information."  19 U.S.C. § 1677e(b); see also Ta Chen Stainless Steel

Pipe Co. v. United States, 31 CIT 794, 812 (2007) (noting that application of AFA is

discretionary).  A respondent fails to cooperate to the best of its ability when it fails "to do the

maximum it is able to do."  Nippon Steel, 337 F.3d at 1382.  In determining whether a party has

failed to do the maximum it is able to do, Commerce first "make[s] an objective showing that a

reasonable and responsible importer would have known that the requested information was

required to be kept and maintained under the applicable statutes, rules, and regulations."  Id.

Commerce also then

>  make[s] a subjective showing that the respondent under investigation not only has
>  failed to promptly produce the requested information, but further that the failure to
>  fully respond is the result of the respondent's lack of cooperation in either:
>  (a) failing to keep and maintain all required records, or (b) failing to put forth its
>  maximum efforts to investigate and obtain the requested information from its
>  records.

Id. at 1382–83.

Commerce may select either partial or total AFA, depending on the severity and scope of a party's failure to respond to a request for information and its failure to cooperate to the best of its ability. Generally, the "use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty." Mukand, Ltd. v. United States, 767 F.3d 1300, 1308 (Fed. Cir. 2014). Where there are "pervasive and persistent deficiencies that cut across all aspects of the data," all of the reported information may be unreliable, making total AFA appropriate. See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citing Steel Auth. of India, Ltd. v. United States, 25 CIT 482, 487–88, 149 F. Supp. 2d 921, 928–29 (2011)).

Commerce's application of total AFA, which is a substitute adverse rate, to Golden Bird is supported by substantial evidence. First, Commerce lawfully used facts available to fill gaps in the record. Golden Bird failed to provide all the export declarations and Phyto-sanitary certificates requested by Commerce, providing instead only a portion of each. I&D Memo at 3–4; Preliminary I&D Memo at 19. The certificates actually provided to Commerce substantiated only a fraction of the net weight of subject merchandise allegedly entered into the United States by Golden Bird. See Golden Bird Analysis Mem. at 2; see also Preliminary I&D Memo at 14–15, 19. Golden Bird also admitted that the price information in its export declarations to the PRC were "potentially false." Preliminary I&D Memo at 19. Thus, Commerce reasonably determined that Golden Bird both failed to comply with Commerce's request for information, and significantly impeded the proceeding. See Fresh Garlic Producers Ass'n v. United States, 121 F. Supp. 3d 1313, 1325 (CIT 2015) ("FGPA I") (sustaining Commerce's use of facts

otherwise available where Golden Bird failed to comply with Commerce's request for export

declarations).[10]

Second, Commerce's application of an adverse inference is supported by substantial

evidence because Golden Bird failed to cooperate to the best of its ability.  Golden Bird's failure

to maintain its export declarations, which it is required to do so for a minimum of three years by

Chinese customs regulations, provided a sufficient basis for Commerce to determine that it failed

to cooperate to the best of its ability.  I&D Memo at 4; Preliminary I&D Memo at 18–19; see

Nippon Steel, 337 F.3d at 1382 ("The [best of its ability] standard . . . does not condone

inattentiveness, carelessness, or inadequate record keeping.").  Golden Bird's argument that it no

longer had a reason to maintain the export declarations because of a change in Chinese value-

added tax ("VAT") tax exemption law is of no moment because the reason Golden Bird should

have maintained a record of its export declarations is simple:  Chinese regulations required it.

See Preliminary I&D Memo at 18.  Further, Golden Bird is no stranger to these types of

proceedings and should know what documents it needs to maintain to demonstrate the accuracy

---

[10] Golden Bird has not argued here that Commerce failed to notify Golden Bird and provide it an adequate opportunity to correct its deficient response. See 19 U.S.C. § 1677m(d) (requiring Commerce to provide a party with the opportunity to correct deficient responses prior to applying facts available).  In any event, Commerce abided by the statute when it provided Golden Bird the opportunity to remedy the deficiencies in its Supplemental Questionnaire Response, in which Golden Bird provided incomplete export declarations and Phyto-sanitary certificates, when Commerce issued the Second Supplemental Questionnaire.  See I&D Memo at 3.  Commerce issued the Second Supplemental Questionnaire on September 29, 2014, thereby notifying Golden Bird of the deficiency, Second Suppl. Golden Bird Quest. at 1, and ultimately provided Golden Bird until October 14, 2014, to file its response, see Golden Bird's Second Suppl. Quest. Resp. at 1, PD 199–202 (Oct. 14, 2014).  This is about twice as long as Commerce typically provides respondents to prepare for verification.  See Preliminary I&D Memo at 17. Commerce, therefore, provided Golden Bird an appropriate opportunity to remedy the identified deficiencies.

of its sales data, specifically as it has failed this requirement before.  See FGPA I, 121 F. Supp.

3d at 1325–27.  Golden Bird compounded that error by also not providing or attempting to

provide Commerce with the Phyto-sanitary certificates,[11] which Golden Bird had indicated it

would be able to obtain.  See Golden Bird's Suppl. Quest. Resp. Part 1 at 3, PD 177–78 (Sept. 5,

2014).  And, despite a specific request from Commerce to provide documents substantiating its

explanation for its inability to obtain the documents, Golden Bird never provided information on

the record, such as letters to its U.S. customers or Customs brokers, showing that it did in fact

request the Phyto-sanitary certificates to comply with Commerce's request.  I&D Memo at 4; see

also Second Suppl. Golden Bird Quest. at Attach. ¶ 17 ("[P]lease provide the remaining, . . .

Phytosanitary certificate[s] . . . .  If unable to do so, please explain why and submit any

supporting documents that substantiate this explanation.").

    Further, Commerce lawfully applied total AFA because Golden Bird failed to

substantiate export volume, which is at the core of an AD duty calculation.  The court has

previously sustained Commerce's application of total AFA in the eighteenth administrative

review where Golden Bird failed to furnish its export declarations, recognizing that "Golden

Bird's sales volume is fundamental to the AD analysis . . . .  It is thus akin to the failure to

provide product-specific sales and cost data . . . ."  FGPA I, 121 F. Supp. 3d at 1326–27 (citing

Mukand, 767 F.3d at 1307).  Indeed, total AFA is appropriate here because the unsubstantiated

---

[11] It is unclear from the record whether a company like Golden Bird is required by Chinese law or Chinese customs regulations to maintain Phyto-sanitary certificates, as opposed to export declarations.  Golden Bird maintains that it was not required to do so.  I&D Memo at 4. Regardless, as discussed above, Commerce's decision to apply an adverse inference is supported by substantial evidence because Golden Bird failed to maintain export declarations, which it was required to do, and failed to demonstrate it had taken steps to secure copies of the Phyto-sanitary certificates.

export volumes concern the entire POR, rather than discrete time periods within the POR.  See

id. at 1327 (distinguishing a case in which the Federal Circuit sustained use of partial AFA

because the deficiencies only affected a discrete month within the POR).  Even though Golden

Bird provided some of the export declarations and Phyto-sanitary certificates, it still has not been

able to substantiate more than three-quarters of its total exports by weight made during the POR,

as initially reported in its Section A Questionnaire Response.  See Golden Bird Analysis Memo

at 2.  And, as discussed, Golden Bird admitted to providing potentially false pricing data to the

PRC.  As pricing data is necessary to calculate an AD duty margin the question is which pricing

data, if any, is correct.  See Papierfabrik August Koehler SE v. United States, 7 F. Supp. 3d

1304, 1314 (CIT 2014) (sustaining application of total AFA where "Commerce could not make

the comparisons between the normal value and U.S. prices necessary for calculating the dumping

margin" because the respondent failed to provide certain sales data).  Thus, Commerce's

application of total AFA is appropriate because the record does not contain sales volume and

pricing information sufficiently reliable for Commerce's purposes and the deficiencies relate to

the entire POR.

      B.      Rejection of Separate Rate Status

     In an AD review involving an NME country, Commerce employs a presumption of state

control.  See Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1372 (Fed. Cir.

2003).  Commerce, therefore, assigns a responding party a country-wide AD duty rate unless the

party rebuts the presumption of state control by establishing de jure and de facto independence

from the NME country's government.  Ad Hoc Shrimp Trade Action Comm. v. United States,

802 F.3d 1339, 1353 (Fed. Cir. 2015) ("Ad Hoc Shrimp") (citing Sigma Corp. v. United States,

117 F.3d 1401, 1405 (Fed. Cir. 1997)).  When a party has demonstrated its independence and

been granted a separate rate in one segment of the proceeding, it can continue to demonstrate its

eligibility for a separate rate by filing a separate rate certification.  See Initiation Notice, 78 Fed.

Reg. at 79,393.

    Relevant here, the court has clarified that the separate rate analysis is separate and

distinct from the selection of an AFA rate.  Yantai Xinke Steel Structure Co. v. United States,

Slip Op. 12-95, 2012 WL 2930182, at *14 (CIT July 18, 2012) ("[I]t is unreasonable for

Commerce to impute the unreliability of a company's questionnaire responses and [other factor

of production and U.S. sales] submissions . . . to its separate rate responses when there is no

evidence on the record indicating that the latter were false, incomplete, or otherwise deficient.").

Commerce's determination that a party is not entitled to a separate rate because its separate rate

information is unreliable must be based on substantial evidence.  See Gerber Food (Yunnan) Co.

v. United States, 29 CIT 753, 771–72, 387 F. Supp. 2d 1270, 1287 (2005).  When Commerce

fails to make a finding that a respondent's separate rate responses were inaccurate or deficient,

its denial of a separate rate is unsupported by substantial evidence.  See Yantai Xinke, 2012 WL

2930182 at *14.

    Commerce's decision to reject Golden Bird's separate rate information is unsupported by

substantial evidence.  Golden Bird filed a separate rate certification and provided information

relevant to its eligibility for a separate rate in its Section A Questionnaire Response.  Golden

Bird's Separate Rate Certification at 1, PD 26–27 (Feb. 4, 2014); Golden Bird's Section A

Quest. Resp. at A-2–A-12, PD 105–13 (June 11, 2014).  In both the Preliminary Results and the

<u>Final Results</u>, Commerce disregarded Golden Bird's separate rate information because, according to Commerce:

> Golden Bird was unable to substantiate its Section A response and its sales transactions.   Because Golden Bird's Section A response and [Supplemental Questionnaire Response] are the very documents in which discrepancies have been revealed (<u>i.e.</u>, Golden Bird has not been able to corroborate its volume and the price in [export declarations] differed from those reported to [Commerce]) we cannot rely on Golden Bird's submitted Section A responses.   The Section A response includes the separate rate information.   Golden Bird's failures in reporting its Section A information taint its reported separate rate information, as well.  Because we determine that the entirety of Golden Bird's information is unusable, including its separate rate information, we find that Golden Bird has failed to rebut the presumption that it is part of the PRC-wide entity.

<u>I&D Memo</u> at 5; <u>see also</u> <u>Preliminary I&D Memo</u> at 19–20.

Commerce improperly disregarded Golden Bird's separate rate information as "tainted" solely because it identified deficiencies in information related to Golden Bird's sales data.  This Commerce cannot do.  See <u>Foshan Shunde Yongjian Housewares & Hardware Co. v. United States</u>, Slip Op. 11-123, 2011 WL 4829947, at *16 (CIT Oct. 12, 1011); <u>Since Hardware (Guangzhou) Co. v. United States</u>, 34 CIT 1262, 1270–71 (2010); <u>Qingdao Taifa Grp. Co. v. United States</u>, 33 CIT 1090, 1098, 637 F. Supp. 2d 1231, 1240–41 (2009) <u>aff'd</u>, 467 F. App'x 887 (Fed. Cir. 2012); <u>Shandong Huarong Gen. Grp. Corp. v. United States</u>, 27 CIT 1568, 1595–96 (2003).  Commerce failed to make an independent finding regarding Golden Bird's separate rate information, but instead imputed deficiencies related to export quantity in both the Section A Questionnaire Response and the Supplemental Questionnaire Responses to all of Golden Bird's submissions, including information submitted by Golden Bird unrelated to export quantity or actual sales data.

The government's reliance on Ad Hoc Shrimp, in which the Federal Circuit held lawful

Commerce's decision to apply the PRC-wide rate as a total AFA rate to a respondent, where

Commerce rejected the respondent's separate rate information because it deemed "the entirety of

[the respondent's] submissions unreliable," is misplaced.  See 802 F.3d at 1357.  In that case,

"the necessary information missing from the record was . . . an accurate representation of [the

respondent's] corporate structure and indications of government control exercised through the

company's Chinese affiliates," and such information was deemed "core, not tangential" to

Commerce's separate rate analysis as it went "to the heart of [the respondent's] corporate

ownership and control."  Id. at 1356, 1357.  Despite the government's arguments, both in its

brief and at oral argument, Ad Hoc Shrimp does not govern because the unreliability of Golden

Bird's export quantity and sales data, which do not relate to "corporate ownership and control,"

cannot be imputed to its separate rate information.  See id. at 1357.  Thus, as in FGPA I,

Commerce's rejection of "Golden Bird's rebuttal evidence on the discrete point of government

control is not reasonable."[12]  121 F. Supp. 3d at 1328.  Indeed, assignment of separate rate status

appears proper given Golden Bird's repeated ability to qualify for a separate rate where

Commerce has actually considered Golden Bird's separate rate information.[13]  See, e.g., Fresh

---

[12] Commerce also has not based its determination on a finding of fraud on the proceeding.  The court need not decide how such a finding would impact this case, but it does not appear proper for Commerce to have rejected wholesale Golden Bird's submissions as unreliable, where extraordinary findings of bad faith and fraud before Commerce were not made.  It is not enough for Commerce to find sales data "unreliable."

[13] And, although FGPA alleged that Golden Bird exported goods produced by entities subjected to the PRC-wide rate, see Pet'rs' Allegations at 2–3, Commerce never made an explicit finding that Golden Bird was engaged in such export funneling activities.  Absent such a finding based on record evidence, it would be inappropriate for the court to take FGPA's allegations as true.

(continued . . .)

Garlic Producers Ass'n v. United States, Slip Op. 16-68, 2016 WL 3693715, at *2, *4 (CIT July

7, 2016) ("FGPA II"); Fresh Garlic Producers Ass'n v. United States, 83 F. Supp. 3d 1330, 1332,

1334 (CIT 2015) (noting that Commerce calculated an individual rate for Golden Bird in the

seventeenth administrative review).  Therefore, Commerce's determination improperly ignores

separate rate record evidence, which directly rebuts and detracts from Commerce's presumption

of state control, and unless Commerce relies on other evidence directly relevant to state control,

Commerce is to assign Golden Bird a separate rate.[14]  See FGPA I, 121 F. Supp. 3d at 1328

(citing Gerber Food, 29 CIT at 771–72, 387 F. Supp. 2d at 1287).

II.     **Xinboda**

       A.      Respondent Selection

       Xinboda argues that Commerce unreasonably denied Xinboda's requests to be examined

as a mandatory respondent and, alternatively, as a voluntary respondent.  Xinboda Br. at 9–16.

With regard to its mandatory respondent request, Xinboda claims it was not required to exhaust

its administrative remedies, due to "changed circumstances" and because Commerce's denial of

---

On the other hand, if Commerce did make a finding that Golden Bird was importing goods on
behalf of companies subject to the PRC-wide rate in order to allow those companies to benefit
from Golden Bird's low rate, such a finding likely could be considered in selecting a total AFA
rate for Golden Bird.  For instance, because deterrence is a factor in selecting an AFA rate, see
F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed.
Cir. 2000), it may be appropriate in that particular situation for Commerce to select a separate
rate incorporating the PRC-wide rate, to deter this type of non-compliance.

[14] As the court has previously held, Commerce on remand shall apply the law in effect at the
time that Commerce determined "that Golden Bird failed to cooperate to the best of its ability
and selected total AFA."  FGPA I, 121 F. Supp. 3d at 1332–33.  Because President Obama
signed the Trade Preferences Extension Act of 2015 ("TPEA") on June 29, 2015, see Pub. L. No.
114-27, 129 Stat. 362 (2015), and Commerce published the instant Preliminary Results, in which
Commerce first made the findings relevant to apply total AFA to Golden Bird, on December 8,
2014, see 79 Fed. Reg. at 72,625–26, the TPEA does not apply on remand.

its requests made any attempt to respond futile.  Pl. Shenzhen Xinboda Indus. Co. Reply Br. 1–6,

ECF No. 55 ("Xinboda Reply Br.").  The government responds that Commerce lawfully denied

both requests because Xinboda failed to exhaust its administrative remedies regarding mandatory

respondent selection and failed to submit the necessary questionnaire responses to be considered

for voluntary respondent status.  Gov't Resp. at 31–34, 39–40; see also FGPA Resp. at 31–40.

The government also refutes the merits of Xinboda's mandatory respondent argument.  Gov't

Resp. at 34–39.

      The court "shall, where appropriate, require the exhaustion of administrative remedies,"

28 U.S.C. § 2637(d), and has consistently held that a respondent who wishes to challenge

Commerce's mandatory respondent selection must exhaust its administrative remedies by

seeking such status itself and pursuing voluntary respondent status in accordance with 19 U.S.C.

§ 1677m(a).  See DuPont Teijin Films China Ltd. v. United States, 7 F. Supp. 3d 1338, 1357

(CIT 2014) ("[A] party aggrieved by not being selected as a mandatory respondent must request

to be reviewed as voluntary respondent under 19 U.S.C. § 1677m(a) before it can challenge the

mandatory respondent selection process in court."); Union Steel Mfg. Co. v. United States, 837

F. Supp. 2d 1307, 1331 (CIT 2012) ("[A] respondent, in order to exhaust administrative

remedies, must pursue the statutory process for receiving an individually-determined margin

before challenging before the court [Commerce's] decision not to assign an individual margin to

it.").  Where Commerce has, under 19 U.S.C. § 1677f-1(c)(2), limited the number of exporters or

producers it will examine, Commerce must establish margins for any exporters or producers that

voluntarily respond and submit the requested information "by the date specified—(i) for

exporters and producers that were initially selected for examination," as long as the number of

exporters and producers that submit the request "is not so large that . . . individual examination . . . would be unduly burdensome . . . and inhibit the timely completion of the investigation." 19 U.S.C. § 1677m(a)(1)(A), (B).

The court has granted exception to the exhaustion requirement under certain circumstances, including where, relevant to this case, "raising the issue at the administrative level would have been futile." Gerber Food (Yunnan) Co. v. United States, 33 CIT 186, 193, 601 F. Supp. 2d 1370, 1377 (2009). The exhaustion requirement reflects a "congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies" before appealing to the court. Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

Xinboda failed to exhaust its administrative remedies regarding the selection of mandatory respondents in this review. Xinboda did not submit responses to the questionnaires issued to the mandatory respondents by the deadlines established for the mandatory respondents. See I&D Memo at 9. Therefore, Xinboda may not challenge the mandatory respondent selection on appeal. See DuPont Teijin, 7 F. Supp. 3d at 1357. Regardless of the timing of FGPA's allegations and the final results of the eighteenth administrative review, Xinboda was still required by statute to submit its responses in a timely fashion. See 19 U.S.C. § 1677m(a)(1)(A); Union Steel, 837 F. Supp. 2d at 1330–31 (holding that because the party did not take the necessary actions to pursue voluntary respondent status it had failed to exhaust its administrative remedies).[15]

---

[15] And, to the extent that Xinboda argues that its claim need not be exhausted because, as a matter of law, Commerce was required to individually examine every exporter in this review

(continued . . .)

Moreover, Xinboda has not demonstrated that any exception to the exhaustion doctrine

applies to this case.  Xinboda knows the history of the case and should have recognized that one

of the mandatory respondents might have received AFA, but Xinboda's requests to be a

mandatory or voluntary respondent and Commerce's subsequent denial both occurred after the

date the questionnaire responses were due.  Thus, such responses cannot be said to have been

futile at the time that Xinboda should have filed them.  Commerce Resp. to Xinboda Respondent

Request at 2–4; see, e.g., DuPont Teijin, 7 F. Supp. 3d at 1357–58 (holding that an expectation

---

because the number of exporters was not sufficiently "large" pursuant to 19 U.S.C. § 1677f-
1(c)(2), Xinboda's argument fails.  The statute provides an exception to the general requirement
that Commerce "determine the individual weighted average dumping margin for each known
exporter and producer of the subject merchandise[,]" where "it is not practicable" to make such a
determination "because of the large number of exporters or producers involved in the . . .
review[.]"  19 U.S.C. § 1677f-1(c).  The court adheres to its previous holding that the statute
"contemplates the entities for whom review was requested, initiated, and not rescinded, and does
not require Commerce to first evaluate whether or to what extend those entities shipped subject
merchandise during the POR."  Ad Hoc Shrimp Trade Action Comm. v. United States, 992 F.
Supp. 2d 1302, 1307 (CIT 2014).  There, the court did not require Commerce to first consider
U.S. Customs and Border Protection ("Customs") data to determine the number of exporters or
producers "involved" in the review.  Id. at 1308. This approach is especially appropriate in this
case, where the accuracy of the Customs data is questioned.  Here, the number of exporters "for
whom review was requested, initiated, and not rescinded," at the time that Commerce conducted
respondent selection, was fifty-four exporters or producers.  See Respondent Selection Mem. at
3; see also Pet'rs' Withdrawal of Certain Reqs. for Admin. Review at 2–4, bar code 3192007-01
(Mar. 31, 2014).  Moreover, before Commerce selected respondents on April 28, 2014, sixteen
additional companies certified that they had no shipments during the POR.  See Qingshui
Vegetable Clarification of No Sales, bar code 3194926-01 (Apr. 10, 2014); Merry Vegetable
Clarification of No Sales, bar code 3194925-01 (Apr. 10, 2014); Chengda Certificate of No
Sales, bar code 3172946-01 (Jan. 10, 2014); Yuanxin Certificate of No Sales, bar code 3172945-
01 (Jan. 10, 2014); XuZhou and Chengwu No Shipment Certification, bar code 3173132-01 (Jan.
10, 2014); Multiple Parties' No Sales Certifications, bar code 3172714-01 (Jan. 8, 2014).
Therefore, there were only thirty-eight potential respondents from which Commerce could have
picked.  Thirty-eight is "non-controversially" large, and, therefore, Commerce acted reasonably.
See Ad Hoc Shrimp Trade Action Comm., 992 F. Supp. 2d at 1309.

that Commerce would not grant voluntary respondent status did not render the any such requests

futile and the party had failed to exhaust its administrative remedies).[16]

      Xinboda's voluntary respondent argument is similarly without merit because, as

discussed, Xinboda did not meet the statutory requirements.  Per Commerce's established

deadlines, the Section A, C, and D questionnaire responses were due on June 27, 2014.  See

Grant of Extension for Golden Bird's Quest. Resps. at 1; Grant of Extension for Hejia Quest.

Resps. at 1.  Xinboda did not submit any questionnaire responses by the deadlines set by

Commerce and has still never provided that information to Commerce.  See I&D Memo at 10–

11.  In fact, Xinboda's initial letter requesting mandatory or voluntary respondent status was

filed on July 1, 2014, after the deadline for the last questionnaire response.  See id. at 9–10.

Furthermore, Xinboda's "change in circumstances" argument, seeking an exception to the

statutory timeline due to the timing of FGPA's allegations, is unconvincing because, in the

circumstances of this review, Xinboda should have submitted the questionnaire responses in a

timely manner or immediately notified Commerce after FGPA's allegations that it needed more

---

[16] Admittedly, Commerce's recent history evidences a questionable tendency not to accept any voluntary respondents.  Nevertheless, the statute requires a respondent to place their own company-specific data on the record by filing the applicable questionnaire responses to be considered for either mandatory or voluntary respondent status.  In this case, Commerce may have actually accepted Xinboda as a mandatory respondent had it placed its information on the record because nearly three months prior to the Preliminary Results being published, Hejia had withdrawn from the review and it was highly likely that Golden Bird would receive an AFA rate. See Preliminary I&D Memo at 12, 13–14 (detailing that Hejia withdrew on September 12, 2014, and that in the same month Commerce first identified the deficiencies in Golden Bird's responses).  Therefore, although Commerce's tendency not to accept voluntary respondents may have the unfortunate effect of discouraging parties from providing their information, Xinboda, a mandatory respondent in previous reviews and a company intimately familiar with the garlic industry, is at fault for its information not being on the record and therefore not being selected as a mandatory respondent in this review.

time to complete its responses.[17]  Xinboda, therefore, had no adequate reason for failing to meet

the requirement.  Thus, Commerce's decision, in isolation, to reject Xinboda's requests for

mandatory respondent status and, alternatively, voluntary respondent status was lawful.  This

decision did have collateral consequences, as will be explained.

      B.     Selection of the Separate Rate

      Xinboda challenges Commerce's selection of the eighteenth administrative review's

$1.82/kg separate rate and its application to this year's separate rate respondents.  Xinboda Br. at

16–20.  Xinboda argues that Commerce unreasonably applied the eighteenth administrative

review's separate rate, which uses the Philippines as the primary surrogate country, because the

Philippines is not considered economically comparable in this review and Commerce's previous

decision to treat the Philippines as a "significant producer" was recently remanded and is still

subject to judicial review.  Id. at 16–19.  Xinboda claims that Commerce instead should have

used the rate from the seventeenth administrative review, which relied on surrogate market data

from the Ukraine.[18]  Id. at 19–20.  The government responds that Commerce was reasonable in

using the eighteenth review rate, given the absence of usable data on the record and the statutory

---

[17] Commerce notified all respondents, including Xinboda, that it had selected Golden Bird and
Hejia as mandatory respondents on April 28, 2014, and issued the questionnaires on May 7 and
9, 2014, nearly two months prior to the last deadline to respond to questionnaires.  Preliminary
I&D Memo at 3–4.

[18] The Ukraine, though not among the countries identified in Commerce's potential surrogate
countries list, had a GNI during this POR that was within the range of economically comparable
countries identified on the list.  List of Surrogate Countries at 2; The World Bank, World
Development Report 2014:  Risk and Opportunity 297 (2013), available at
http://siteresources.worldbank.org/EXTNWDR2013/Resources/8258024-
1352909193861/8936935-1356011448215/8986901-1380046989056/WDR-
2014_Complete_Report.pdf (last visited July 18, 2016) (indicating that Ukraine had a per capita
GNI of $3,500).

preference for contemporaneity.  Gov't Resp. at 41–45.  The government also claims that the

removal of the Philippines from this review's list of economically comparable countries does not

affect the applicability of the rate.  Gov't Resp. at 43–44.

Because the statute is silent on the method of calculation for a separate rate within the

NME context, Commerce's practice is to determine separate rates according to the methodology

used to calculate the "all others rate" pursuant to 19 U.S.C. § 1673d(c)(5).  See Yangzhou

Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1374 (Fed. Cir. 2013) ("The

separate rate for eligible non-mandatory respondents is generally calculated following the

statutory method for determining the 'all others rate' under § 1673d(c)(5)(A)."); see, e.g.,

Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1372 (Fed. Cir.

2012) (utilizing 19 U.S.C. § 1673d(c)(5) for a separate rate determination for PRC respondents).

By statute, the all others duty rate is calculated as the weighted average of the dumping margins

established for individually-investigated respondents, excluding any margins that are zero, de

minimis, or determined solely under facts available.  19 U.S.C. § 1673d(c)(5)(A).  When all

individually-investigated respondents are assigned margins that are zero, de minimis, or

determined solely under facts available, "[Commerce] may use any reasonable method to

establish the estimated all-others rate."  19 U.S.C. § 1673d(c)(5)(B).  The Statement of

Administrative Action ("SAA"), however, states that the "expected method" in such cases is to

weight-average the margins, "provided that volume data is available," unless:  (1) it is not

feasible to do so, or (2) the resulting average would not be "reasonably reflective" of the

dumping margins of other exporters or producers.  Uruguay Round Agreements Act, Statement

of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873, <u>reprinted in</u> 1994 U.S.C.C.A.N.

4040, 4201 ("SAA").[19]

  Commerce reasonably did not apply the "expected method" of averaging the rates of the

mandatory respondents in this case because volume data is not available and such a method

would not yield a margin reasonably reflective of the separate rate respondents' behavior.  First,

because of the absence of usable data from the review, Commerce did not have any volume data

available and therefore, in accordance with the SAA, could not weight-average the rates of the

mandatory respondents.  <u>See</u> SAA, H.R. Doc. No. 103-316, vol. 1, at 873, <u>reprinted in</u> 1994

U.S.C.C.A.N. at 4201.  Second, the rate resulting from averaging would not be reasonably

reflective of Xinboda's and other separate rate respondents' potential dumping margins because

both mandatory respondents received total AFA rates, which are calculated from adverse

inferences and, at $4.71/kg, are much higher than the previous rates selected for separate rate

respondents.  <u>See</u> <u>Albemarle Corp. & Subsidiaries v. United States</u>, 821 F.3d 1345, 1355–56

(Fed. Cir. 2016) (holding that the difference between a $0.44/kg prior margin and a $0.11/kg

average margin was sufficient to support a conclusion that averaging might not be reasonably

reflective); <u>see also</u> <u>Fresh Garlic from the People's Republic of China:  Final Results and Partial</u>

<u>Rescission of the 18th Antidumping Duty Administrative Review; 2011–2012</u>, 79 Fed. Reg.

36,721, 36,723 (Dep't Commerce June 30, 2014) ("<u>AR18 Final Results</u>") (assigning a $1.82/kg

separate rate in the eighteenth administrative review); <u>Fresh Garlic from the People's Republic</u>

---

[19] Under 19 U.S.C. § 3512(d) "[t]he statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."

of China:  Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg.

36,168, 36,169 (Dep't Commerce June 17, 2013) ("AR17 Final Results") (assigning a $1.28/kg

separate rate in the seventeenth administrative review); Fresh Garlic from the People's Republic

of China:  Final Results of the 2009–2010 Administrative Review of the Antidumping Duty

Order, 77 Fed. Reg. 34,346, 34,348 (Dep't Commerce June 11, 2012) ("AR16 Final Results")

(assigning a $0.41/kg separate rate in the sixteenth administrative review).  And, although

Commerce may assign adverse inferences where "an interested party has failed to cooperate by

not acting to the best of its ability to comply with a request for information," 19 U.S.C.

§ 1677e(b)(1), neither Xinboda nor any other separate rate respondent failed to cooperate in the

review.[20]  In fact, after selecting mandatory respondents, Commerce did not request further

information from the separate rate respondents.  Therefore, Commerce lawfully did not establish

the separate rate pursuant to the so-called "expected method."

      Commerce's selection of the separate rate from the immediately preceding eighteenth

administrative review, however, was unreasonable given the unique circumstances of this case.

At first blush, Commerce's methodology to use the separate rate from the previous review, i.e.

the most contemporaneous separate rate information available, appears reasonable.[21]  Indeed,

---

[20] In AD duty cases, the court does not accept application of adverse inferences or rates based upon adverse inferences to cooperating separate rate respondents.  See SKF USA Inc. v. United States, 34 CIT 1866, 1879, 675 F. Supp. 2d 1264, 1277 (2009) ("The court cannot accept a construction of 19 U.S.C. § 1677e(b) under which the party who suffers the effect of the adverse inference is not the party who failed to cooperate.").

[21] The Federal Circuit, in Albemarle, held that the application of information, including duty rates, from a prior review may be reasonable under at least two circumstances:  (1) "where there is evidence that the overall market and the dumping margins have not changed from period to period," and (2) where Commerce is constructing an AFA rate.  821 F.3d at 1357; see also Atar

(continued . . .)

Commerce must strive for accuracy when it is calculating margins, and utilizing the most

contemporaneous information furthers that goal.  See Albemarle, 821 F.3d at 1356 ("[O]ur

analysis is guided by the statute's manifest preference for contemporaneity in periodic

administrative reviews."); Yangzhou Bestpak, 716 F.3d at 1379 ("An overriding purpose of

Commerce's administration of antidumping laws is to calculate dumping margins as accurately

as possible.").  Although it would typically be preferable for Commerce to use information or

apply a rate from an ongoing review, Albemarle, 821 F.3d at 1357 ("That the prior rates were

near in time cannot in and of itself justify their use in a subsequent review."), such

contemporaneous information does not exist on the record of this review.[22]

---

S.R.L. v. United States, 730 F.3d 1320, 1327 (Fed. Cir. 2013) (allowing use of data from a prior review where "the record contains no indication that the relevant market underwent any substantial intervening change that would meaningfully distinguish the period").  In evaluating the former circumstance, the Federal Circuit considered fluctuations in margins, financial ratios, and normal values between the previous year and the year under review.  See Albemarle, 821 F.3d at 1357.

[22] Although Commerce may not "explain the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making," Yangzhou Bestpak, 716 F.3d at 1378, it does not appear Commerce is entirely at fault in this case.  It did create a problem by selecting only two mandatory respondents, but the two mandatory respondents it did select failed to provide usable data from which to calculate a separate rate.  Further, Xinboda—as well as the other separate rate respondents—could have put contemporaneous information on the record had it properly sought mandatory or voluntary respondent status.  But, as discussed, it failed to do so.

This is not to say that Commerce could not or should not seek to remedy this problem.  In the context of separate rates, Commerce has in the past reopened the record and collected information from separate rate respondents to confirm the propriety of its selected separate rate.  See, e.g., Amanda Foods (Viet.) Ltd. v. United States, 774 F. Supp. 2d 1286, 1291–92 (CIT 2011).  Here, Commerce on remand may reopen the administrative record to collect information from separate rate companies, or even to select new mandatory respondents to review, resulting in a usable separate rate calculation.  Given Commerce's current course, where it continues to select Golden Bird as a mandatory respondent, even in the twentieth administrative review after twice previously assigning it total AFA, Commerce would be wise to either stop selecting

(continued . . .)

But, Commerce's methodology as applied here, where it selected a separate rate that has been held unlawful, may not be sustained.  In <u>FGPA I</u> and <u>FGPA II</u>, the court twice remanded the final results of the eighteenth administrative review to Commerce because its selection of the Philippines as the primary surrogate country was not supported by substantial evidence as Commerce had not shown that the Philippines was a significant producer of subject merchandise. See <u>FGPA II</u>, 2016 WL 3693715, at *5–7; <u>FGPA I</u>, 121 F. Supp. 3d at 1340.  Xinboda is correct that it would be unreasonable for Commerce to select a separate rate that Commerce improperly calculated and knows to be unlawful.  <u>See</u> Xinboda Br. at 16, 18–19.  Commerce, by relying on a rate calculated using a primary surrogate country that does not appear to be a significant producer of subject merchandise, essentially employed a methodology here that allowed it to select a rate calculated in violation of its own policies.  <u>See, e.g.</u>, Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process, (Mar. 1, 2004), <u>available at</u> http://enforcement.trade.gov/policy/bull04-1.html (last visited July 14, 2016).  In fact, despite the government's arguments to the contrary, when Commerce first relied on the eighteenth administrative review's separate rate on December 8, 2014, in the <u>Preliminary Results</u> of this review, <u>see</u> 79 Fed. Reg. at 72,627, it was already on notice that the eighteenth administrative review's final results had been appealed as early as July 1, 2014, and that the validity of the

---

Golden Bird or, if it insists on selecting a party that is highly likely to receive an AFA rate, to select a third mandatory respondent, or even a fourth, that is likely to cooperate <u>at the outset</u> of the review.  <u>See</u> Decision Memorandum for the Preliminary Results of the 2013–2014 Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic of China at 3, A-570-831, (Nov. 30, 2015), <u>available at</u> http://enforcement.trade.gov/frn/summary/prc/2015-30791-1.pdf (last visited July 15, 2016) (selecting Golden Bird as a mandatory respondent, and eventually selecting a third mandatory respondent only after Golden Bird notified Commerce that it would not respond).

$1.82/kg rate was at issue.  See Compl. ¶ 1–10, 12, 14, Shenzen Xinboda Indus. Co. v. United

States, No. 14-00154, ECF No. 7 (consolidated under FGPA I, No. 14-00180).[23]  Furthermore,

because the court is remanding the issue of Golden Bird's rate, interests of finality do not weigh

against the court's decision to also remand the separate rate issue in this case so that a usable rate

maybe selected or calculated for all of the unreviewed separate rate respondents.[24]

## CONCLUSION

For the foregoing reasons, the Final Results are sustained in part and remanded in part.

On remand, Commerce is to evaluate record evidence regarding Golden Bird's independence

from government control to determine whether Golden Bird is entitled to a separate rate and may

not rely on a finding of unreliable sales data.  If Commerce determines upon remand that Golden

Bird is entitled to a separate rate, Commerce may select an appropriate total AFA rate, as the

---

[23] Xinboda's other argument, which claims it was unreasonable for Commerce to apply a rate that had been based on surrogate market data from the Philippines where the Philippines is not included on the list of countries economically comparable to the PRC for this review, is unconvincing.  See List of Surrogate Countries at 2.  In the eighteenth administrative review during which the separate rate at issue was calculated, the Philippines was considered economically comparable to the PRC.  See Surrogate Countries Selection AR 18, bar code 3133689-01 (May 2, 2013).  Thus, at the time the rate was calculated, there was no issue of economic comparability.

[24] Commerce's selection of an unsupported rate has important effects, given that there are a number of other companies directly affected by Commerce's decision or potentially affected in the future.  See Final Results, 80 Fed. Reg. at 34,142 (listing seven companies in total that received separate rates in this review); see also Initiation Notice, 78 Fed. Reg. at 79,395–97 (listing 147 companies for which Commerce originally initiated the nineteenth administrative review); Preliminary I&D Memo at 2; Albemarle, 821 F.3d at 1358 ("It was unreasonable in this case for Commerce to choose to limit its review to the two largest volume exporters, refuse to collect additional data from Huahui, and then draw inferences adverse to Huahui based on the lack of data available on the record."); KYD, Inc. v. United States, 607 F.3d 760, 767 (Fed. Cir. 2010) ("The antidumping laws 'are remedial not punitive.'" (quoting NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995))).

Consol. Court No. 15-00179                                          Page 31

determination of AFA applicability has been sustained here.  Further, on remand, Commerce

shall reconsider the separate rate applied to Xinboda and the other non-examined companies, by

either employing a different reasonable method to calculate the separate rate, such as reopening

the record to examine new mandatory respondents, reopening the record to collect information

from which to calculate a reliable separate rate, or if it results in a non-punitive rate for separate

respondents, adjusting the separate rate assigned based on the results of the remand pursuant to

FGPA II.  Commerce shall advise the court by August 15, 2016 as to the appropriate scheduling

for filing its remand results after it decides which way it is going to proceed.


Dated: July 27, 2016                                    /s/ Jane A. Restani
       New York, New York                              Jane A. Restani
                                                           Judge